**MID–STATE AFTERMARKET BODY PARTS, INC., Plaintiff/Counter–Defendant.**

v.

**MQVP, INC., f/k/a Global Validators, Inc., Defendant/Counter–Plaintiff.**

No. 4:03CV00733 JLH.

United States District Court,
E.D. Arkansas,
Western Division.

March 16, 2005.

Andrew Verne Francis, Attorney at Law, Little Rock, AR, Mark Mitchell Grossman, Grossman Law Offices, Chicago, IL, for Plaintiff.

John R. Elrod, Todd Patrick Lewis, Conner & Winters, P.L.L.C., Fayetteville, AR, Lawrence R. Jordan, Joseph H. Heckendorn, Jaffe, Raitt, Heuer & Weiss, P.C., Michael J. Sullivan, Brian M. Ziff, Moheeb H. Murray, Clark Hill PLC, Detroit, MI, for Defendant/Counter-Claimant.

## MEMORANDUM OPINION

HOLMES, District Judge.

This is a Lanham Act case. Mid-State filed a complaint for declaratory judgment asking the Court to declare that its statements that it has "MQVP parts available" do not infringe on the registered service mark of MQVP, Inc., f/k/a Global Validators, Inc. MQVP, Inc., filed a counterclaim alleging that Mid-State had committed false designation in violation of 15 U.S.C. § 1125(a), trademark infringement in violation of 15 U.S.C. § 1114, counterfeiting in violation of 15 U.S.C. §§ 1114 and 1116, and deceptive trade practices in violation of the Arkansas Deceptive Trade Practices Act, Ark.Code Ann. § 4-88-101 *et seq.*, as well as the common law torts of unfair competition and tortious interference with business expectancies. Discovery is complete. The parties have filed cross motions for summary judgment.

### I.

MQVP, Inc., a for-profit corporation, is the owner of the registered service mark MQVP®.[1] MQVP is an acronym for Manufacturers' Qualification and Validation Program. MQVP, Inc.'s amended counterclaim describes the program as a "global supply chain quality assurance program." In its brief in support of its motion for summary judgment, MQVP, Inc., states,

1. Global Validators, Inc., applied for and received service mark registration in 2001. In 2003, Global Validators, Inc., changed its name to MQVP, Inc.

"MQVP® is an after-market parts monitoring program a service [sic], which provides complete quality assurance to the highest international standards for a chain of distribution of parts which have been manufactured and warranted by *only* MQVP® participating manufacturers." (Emphasis in the original.)

Participants in the MQVP program include manufacturers of aftermarket automobile body parts, distributors of aftermarket automobile body parts, and insurance companies. To participate in the program, manufacturers must be ISO/QS–9000 registered. They must also participate in an online reporting system called GOCERTS®, which is an acronym for Global Online Certification System. MQVP, Inc., says that a qualified part in the GOCERTS® system is fully traceable from the manufacturer to the vehicle on which it is installed. Distributors who wish to participate in the MQVP program must achieve ISO 9000 certification and must also participate in the GOCERTS® online system. The program also provides for an online reporting system known as GOCAR®, which is an acronym for Global Online Corrective Action Reporting. Manufacturers and distributors agree to abide by certain standards, including those stated above, and they pay fees to MQVP, Inc., to participate in the program. In return, MQVP, Inc., authorizes participating manufacturers and distributors to use the MQVP® mark. The current version of the MQVP manual provided to manufacturers states, "[m]anufacturers that have successfully completed a Due Diligence Review will be recognized as 'conditionally approved' and may begin to represent their selected products as MQVP® approved." The previous iterations of the same manual have had substantially the same language. Similarly, the contract that MQVP, Inc., offers to distributors, or at least the contract that it offered to Mid–State in 2003, contemplates that a distributor will use the MQVP® mark in conjunction with part numbers identified by MQVP, Inc., as being included in the program. The record is not clear as to how insurers participate in the program, beyond the fact that they request collision repair shops to use MQVP parts in making repairs.

As noted, MQVP, Inc., solicited Mid–State in 2003 to participate in the program. Mid–State declined. Nevertheless, Mid–State has advertised that it has "MQVP parts available" and continues to do so. Mid–State has also orally stated to customers or potential customers that it has MQVP parts available. Mid–State's officers have testified that those oral statements are always accompanied by a disclaimer that Mid–State is not a participant in the MQVP program. Two trade journal articles have reported that Mid–State states that it has MQVP parts available but also that Mid–State is not a participant in the MQVP program. One advertisement stating that Mid–State has "MQVP parts available" included Mid–State's disclaimer that it is not a participant in the MQVP program, though the disclaimer was in minute, inconspicuous print that is nearly indiscernible.

Mid–State contends that its statement that it has "MQVP parts available" is literally true because it buys parts from manufacturers who participate in the MQVP program, and the parts it buys are identical to those that are certified as MQVP parts when sold through distributors who participate in the MQVP program. On the other hand, MQVP, Inc., contends that Mid–State's assertions that it has "MQVP parts available" are false because no part can be considered an MQVP part unless it is included in the GOCERTS® system, which means that no part can be an

"MQVP part" after it is sold to a distributor who does not participate in the MQVP program.

MQVP, Inc., argues that traceability is an essential component of its program and therefore essential to the determination of whether a part is an MQVP part or an MQVP approved part. According to MQVP, Inc.'s argument, even if parts sold by Mid–State are identical to parts that are sold by distributors in the program as MQVP parts, those parts cannot be considered MQVP parts when sold by Mid–State because they are not in the GOCERTS® system and therefore are not traceable.

## II.

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading misrepresentation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

MQVP, Inc., does not specify whether its claim is brought under subsection (A) or (B). It cites *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 936 (8th Cir.2003), and *United Industries Corp. v. Clorox Co.*,

140 F.3d 1175, 1179–80 (8th Cir.1998). *DaimlerChrysler* arose under subsection (A), which is the false designation of origin prong of the statute. Subsection (A) requires, as a necessary element of the claim, that the defendant used in commerce a protected mark or a colorable imitation thereof. *DaimlerChrysler*, 315 F.3d at 936. The elements of a claim under subsection (A) are substantially similar, if not identical, to the elements of a claim of trademark infringement under 15 U.S.C. § 1114(1). *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3rd Cir.2000). *Clorox*, on the other hand, addressed a claim under subsection (B), which is the false or deceptive advertising prong of the Lanham Act. To establish a claim under that subsection, "a plaintiff must prove: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *Clorox*, 140 F.3d at 1180. "The false statement necessary to establish a Lanham Act violation generally falls into one of two categories: (1) commercial claims that are literally false as a factual matter; and (2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Id.*

■ The purpose of the Lanham Act is to protect both consumers and competitors against misdescription or misrepresentation of products and services. *Ga-*

ston's *White River Resort v. Rush*, 701 F.Supp. 1431, 1434 (W.D.Ark.1988). The Arkansas law of unfair competition is in accord with the general principles of the Lanham Act. *Id.* at 1435. MQVP, Inc.'s contentions that Mid–State violated the Arkansas Deceptive Trade Practices Act and committed the common law tort of unfair competition are therefore dependent upon proving the Lanham Act violations. *Id.*

In short, all of MQVP, Inc.'s claims require a finding that Mid–State's assertions that it has "MQVP parts available" are false statements of fact or statements that are likely to deceive or to cause confusion. Whether those statements are false statements of fact, and whether they are likely to cause confusion or deception, depend on what it means to state that a part is an "MQVP part." Those questions, in turn, depend on the nature of the MQVP® mark.

### III.

The Lanham Act distinguishes between the terms *trademark, service mark, certification mark,* and *collective mark.*[2]

The term "trademark" includes any word, name, symbol, or device, or any combination thereof—

(1) used by a person, or

(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

The term "service mark" means any word, name, symbol, or device, or any combination thereof—

(1) used by a person, or

(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown. Titles, character names, and other distinctive features of radio or television programs may be registered as service marks notwithstanding that they, or the programs, may advertise the goods of the sponsor.

The term "certification mark" means any word, name, symbol, or device, or any combination thereof—

(1) used by a person other than its owner, or

(2) which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this chapter,

to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization.

15 U.S.C. § 1127. Thus, the term *trademark* refers to marks that identify goods; the term *service mark* refers to marks that identify services; and the term *certification mark* refers to marks used by persons other than the mark's owner to certify some quality or characteristic of goods or services. A certification mark may be one of three types. The first type is a certification of quality, such as the "Good Housekeeping Seal" type of certification of quality of goods or services or the Underwriters Laboratories standards and testing type of mark. 3 J. Thomas McCarthy,

**2.** The term *collective mark* is not at issue in this case and will not be discussed further.

McCarthy on Trademarks and Unfair Competition § 19:91 (4th ed.2004). The second type is a certification of regional origin. *Id.* The third type is a certification that the goods were made or services were performed by members of a union or other organization. *Id.* Unlike trademarks and collective marks, certification marks do not identify the source or sponsor of goods or services. Restatement (Third) Unfair Competition § 11 cmt. a (1995).

Much of the difficulty in this case stems from the issue of what type of mark MQVP® is. The mark MQVP® is registered on the principal register of the United States Patent and Trademark Office as a service mark. If MQVP® is a service mark, then it should be used to identify services rather than products. Nevertheless, MQVP, Inc., uses the mark MQVP® to refer to products, and it licenses others to use the mark MQVP® to refer to products. It licenses others to use the mark to certify material, mode of manufacture, quality, accuracy, or other characteristics of those products.

For example, as noted above, MQVP, Inc.'s amended counterclaim describes the program as a "quality assurance program," and its brief in support of its motion for summary judgment says that the program "provides complete quality assurance. . . ." MQVP, Inc.'s amended counterclaim also uses the phrase, "MQVP® approved parts." MQVP, Inc.'s Exhibit 6 in support of its motion for summary judgment on Mid–State's complaint is an MQVP brochure describing the program and its benefits to participants. That brochure states, "MQVP™ will establish quality expectations and verify the effectiveness of the manufacturers' and distributors' quality systems for acceptance by the insurance industry and consumers." Further, "[w]hat this means is, for the first time, aftermarket part manufacturing processes are required to meet QS–9000 quality standards and must produce part quality equal

to or better than original equipment. Anything less will remove the specific parts or the manufacturer from our program."

MQVP, Inc.'s briefs differentiate its program from "other competing certification programs (e.g., CAPA®)." CAPA stands for Certified Automotive Parts Association. CAPA is a non-profit organization that administers a program designed to guarantee the suitability and quality of automotive parts. CAPA is MQVP, Inc.'s only competitor. According to the affidavit of William Hanlon, the attorney who prosecuted the service mark application for MQVP, Inc., CAPA obtained a certification mark whereas MQVP chose to obtain a service mark. MQVP, Inc.'s Exhibit 6 states:

> Global Validators has taken the spirit of CAPA, added the globally recognized quality standard to which all OEM's manufacture, included the added value of cradle to grave traceability and accountability and empowered it with on-line reporting software. The result is a part that is engineered to OE standards, manufactured to QS–9000 standards, shipped and handled by ISO 9000 registered distributors and installed on the vehicle for which it was ordered, completing a quality repair. Never before could such a claim be made by the collision repair industry. Only an extensive process management system such as MQVP™ is capable of consistently delivering quality products.
>
> As of May 1, 2001 approximately 2650 parts have been accepted into MQVP™. Of these, 396 have been certified by CAPA.

In his deposition, William Hindelang, President of MQVP, Inc., testified that the name *Manufacturers' Qualification and Validation Program* was derived by "stringing together the components of the issue at hand. Manufacturers of aftermar-

ket body parts needed to be qualified and their parts needed to be approved and then validated through a system of quality assurance." As noted above, the MQVP manual provided to manufacturers authorizes manufacturers to represent products as "MQVP® approved."

In short, MQVP, Inc., has consistently described its program as a quality assurance program; it has referred to "MQVP® parts" and "MQVP® approved parts"; it has licensed manufacturers and distributors to use the MQVP® mark to certify the quality or other characteristics of the manufacturers' goods and the distributors' services; and it has used its mark in competition with the certification mark CAPA. In business documents describing the program, in its pleadings in this case, and in the sworn testimony of its president, MQVP, Inc., has explained its mark in a manner that suggests that the mark is a certification mark.

Moreover, many of the arguments made by MQVP, Inc., as to why Mid–State's use of the mark is deceptive are arguments that would fit a certification mark but do not fit a service mark. For example, in MQVP, Inc.'s brief in support of its motion for summary judgment as to its amended counterclaim, it says, "The distributor is deceiving the consumer by identifying a part as MQVP® that does not have the same **validated** quality, fit, form, function, durability, appearance and safety of an authentic MQVP® part." (Emphasis in the original.) In substance, MQVP, Inc., argues that Mid–State has misapplied a certification mark and deceived consumers as a result. MQVP, Inc.'s argument distinguishes "an authentic MQVP® part," which has a "validated quality, fit, form, function, durability, appearance and safety" from a part that is not an authentic MQVP part because it lacks the same validated quality, fit, form, function, durability, appearance and safety. Thus, not only

has MQVP, Inc., consistently described its mark in terms that fit the definition of *certification mark* in 15 U.S.C. § 1127, its argument in this case as to why Mid–State's use of the mark is deceptive depends upon the mark being understood as a certification mark.

Even so, MQVP, Inc., registered its mark as a service mark. MQVP, Inc., strenuously denies in this case that its mark is a certification mark and insists that it is a service mark. In oral argument, MQVP, Inc.'s attorney stated, "It's a service mark, and it should be a service mark, because what MQVP does is provide a service. There's two key elements of that service: one is quality assurance, two is traceability."

MQVP, Inc.'s assertion that the mark is and should be treated as a service mark fails to confront two critical issues. First, if MQVP® is a service mark, how can that mark be used to refer to goods? The record is replete with references by MQVP, Inc., to "MQVP parts" and "MQVP approved parts." A trademark identifies goods, and a certification mark may refer to goods or services, but a service mark identifies services. If MQVP® is a service mark, then it does not refer to goods. If it does not refer to goods, the phrase *MQVP parts* is nonsensical; like the phrase *horse feathers*, the phrase can be spoken and written, but it means nothing. Second, MQVP, Inc., does not simply provide a service that permits manufacturers and distributors to improve their quality; MQVP, Inc., also licenses those manufacturers and distributors to use the MQVP® mark to certify the quality and other characteristics of specified aftermarket body parts. MQVP, Inc., provides a service, but the service it provides is substantially the same type of service as the Good Housekeeping seal or the Underwriters Laboratories, Inc., certification. MQVP, Inc., never explains how it can be that it com-

petes with CAPA when the CAPA mark is a certification mark, but the MQVP® mark is not.

With these difficulties in mind, we turn to the merits of the case.

## IV.

### (a) False Advertising

■ MQVP, Inc., argues that Mid–State's statements that it has "MQVP parts available" are literally false, so the Court may grant relief without considering whether the buying public was actually misled; or, in the alternative, that Mid–State's statements implicitly convey a false impression, are misleading in context, or are likely to deceive consumers. *Clorox,* 140 F.3d at 1180. Mid–State responds that it truly does have "MQVP parts available" because it has parts manufactured by MQVP approved manufacturers identical to the parts that those manufacturers ship to MQVP approved distributors and sold, with MQVP, Inc.'s approval, as MQVP parts.

If the MQVP® mark were a certification mark, Mid–State's statements that it has "MQVP parts available" would be ambiguous. Those statements could be taken to mean that they have parts in stock that were manufactured by MQVP approved manufacturers according to MQVP standards; or those statements could be taken to mean that Mid–State can sell parts that MQVP, Inc., will validate or certify. If taken in the first sense, there is evidence from which a jury could conclude that the statements would be true; if taken in the second sense, the statements would be false. Statements that are literally true or ambiguous but nevertheless have a tendency to mislead or deceive the consumer are actionable under the Lanham Act. *Clorox,* 140 F.3d at 1182. If a commercial claim is not literally false but is misleading in context, proof that the advertising conveyed the implied message and thereby deceived

a significant portion of the recipients becomes critical. *Id.* Unless a commercial claim is literally false, or a trier of fact has determined that a competitor acted willfully with intent to deceive or in bad faith, a party seeking relief under the false advertising prong of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), "bears the ultimate burden of proving actual deception by using reliable consumer or market research." *Id.* at 1183. MQVP, Inc., has submitted evidence that a few collision repair shops have believed that parts they purchased from Mid–State were manufactured by MQVP approved manufacturers and were identical to parts sold by MQVP approved distributors, but MQVP, Inc., has presented no evidence that anyone has ever believed that parts sold by Mid–State as "MQVP parts" were fully traceable in the GOCERTS® system or that MQVP, Inc., would validate those parts.

If the mark is a service mark, the phrase *MQVP parts* is nonsense; it means nothing. At best, Mid–State's statements that it has "MQVP parts available" would be ambiguous if the mark is a service mark. Even if the statements conveyed a false impression, MQVP, Inc., would have the burden of proving actual deception by using reliable consumer or market research. It has submitted no evidence that would meet this burden. MQVP, Inc., has submitted no reliable consumer or market research; and it has submitted no evidence that its customers—manufacturers and distributors of aftermarket body parts and insurance companies—have been deceived by Mid–State's statements. For reasons that will be stated in the next section of this opinion, summary judgment will be granted on MQVP, Inc.'s false advertising claim.

### (b) Trademark Infringement, False Designation, and Counterfeiting

As noted above, the essential elements that MQVP, Inc., must prove in order to

establish a claim of trademark infringement, false designation of origin, or counterfeiting are substantially the same. Section 1125(a) creates civil liability for any person who "uses in commerce any ... symbol, or device ... or any false designation of origin, false or misleading description of fact or ... representation of fact, which ... is likely to cause confusion, ... mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). *See also DaimlerChrysler,* 315 F.3d at 936. Similarly, § 1114 authorizes a civil action by the owner of a registered mark against a person who, without the consent of the registrant, uses in commerce any reproduction, counterfeit, copy, or imitation of a registered mark in connection with the sale or offering for sale of any goods or services under circumstances in which such use is likely to cause confusion, or to cause mistake, or to deceive; or uses a mark on labels, signs, prints, packages, wrappers, receptacles or advertisements in connection with the sale or offering for sale of goods or services in circumstances that are likely to cause confusion, or to cause mistake, or to deceive. 15 U.S.C. § 1114.

■ "Only distinctive marks are entitled to protection." *Co–Rect Prods., Inc. v. Marvy! Adver. Photography, Inc.,* 780 F.2d 1324, 1329 (8th Cir.1985). To determine whether a mark is distinctive and merits protection, the Court must first classify the mark in to one of four categories: (1) arbitrary or fanciful, (2) suggestive, (3) descriptive, or (4) generic. *Duluth News–Tribune v. Mesabi Pub. Co.,* 84 F.3d 1093, 1096 (8th Cir.1996); *Co–Rect*

*Prods.,* 780 F.2d at 1329. A generic mark is one that refers to the common name or the nature of an article. *Co–Rect Prods.,* 780 F.2d at 1329. Such a mark is not entitled to trademark protection. *Id.* A descriptive mark designates the characteristics, qualities, effects, or other features of the product and is protectable only if shown to have acquired a secondary meaning. *Id.* Arbitrary or suggestive marks are inherently distinctive. RESTATEMENT (THIRD) UNFAIR COMPETITION § 13 cmt. c. A designation that is likely to be perceived by prospective purchasers as merely descriptive of the nature, qualities, or other characteristics of the goods, services, or business with which it is used is not inherently distinctive and can be protected only if the mark has acquired a secondary meaning. RESTATEMENT (THIRD) UNFAIR COMPETITION § 14. The reason is:

A person cannot, by mere adoption and use, obtain exclusive rights in words that describe the attributes of the goods, services, or business to which the words are applied. Prospective purchasers are likely to understand such words in their descriptive sense rather than as indications of source. Appropriation of descriptive words can also limit the ability of other sellers to emphasize the characteristics of their own goods, services, or business by restricting the manner in which the descriptive term can be used. Over time, however, the descriptive meaning of a word may become subordinate and the word may become instead primarily a symbol of identification. The threat of confusion or deception resulting from the use of the word by others will then ordinarily outweigh the costs of restricting access, particularly in light of the right of competitors to make "fair use" of the word in its original descriptive sense.

*Id.* at § 14 cmt. a.

The concept of distinctiveness as applied to certification marks differs from its

meaning in regard to trademarks and service marks. With regard to trademarks and service marks, distinctiveness refers to the ability of a designation to identify the goods, services, or business of a particular entity or group, but as to certification marks, distinctiveness refers to the ability of the designation to indicate that a particular person has certified some fact concerning the goods or services on which the designation appears. RESTATEMENT (THIRD) UNFAIR COMPETITION § 11 cmt. b.

> A certification mark is distinctive if prospective purchasers recognize the mark as an indication that a particular person, whether known or anonymous, has certified that the goods or services meet the standards established for authorized use of the mark. Many certification marks expressly indicate both the fact of certification and the identity of the certifying party. Such marks are inherently distinctive under the rules stated in Section 13(a).

*Id.*

■ If the MQVP® mark were a certification mark, it would unquestionably meet the requirement of distinctiveness as stated in the commentary to the Restatement. Two designations are used in the United States to indicate that a particular person has certified some fact concerning aftermarket body parts: CAPA® and MQVP®. The MQVP® mark, if used as a certification mark, would indicate both the fact of the certification and the identity of the certifying party. As such, it would be inherently distinctive.

On the other hand, MQVP, Inc., insists that its mark is not a certification mark but is a service mark. Mid–State argues that the name "Manufacturers' Qualification and Validation Program" is descriptive of the nature of the services offered, and that reducing that description to an acronym or an abbreviation does not change the descriptive nature of the underlying term. In support of that argument, Mid–State cites *National Conference of Bar Examiners v. Multistate Legal Studies, Inc.,* 692 F.2d. 478, 488 (7th Cir. 1982), and *FS Services, Inc. v. Custom Farm Services, Inc.,* 471 F.2d 671, 674 (7th Cir.1972). In *National Conference of Bar Examiners,* the Seventh Circuit held that the phrase *multi-state bar examination* is descriptive, and that its acronym, MBE, is also descriptive because abbreviations "for generic or common descriptive phrases must be treated similarly." *Nat'l Conf. of Bar Exam'rs,* 692 F.2d at 488. In *FS Services, Inc.,* the Seventh Circuit held that the letters FS had come to signify "farm service" or "farm supply," that the words "farm service" or "farm supply" are descriptive or generic, and that abbreviations for such terms where they are generally recognized must be treated similarly. *FS Servs.,* 471 F.2d at 674.

In response, MQVP, Inc., relies upon *Anheuser–Busch, Inc. v. Stroh Brewery Co.,* 750 F.2d 631 (8th Cir.1984). There, the Eighth Circuit held that it was a fact question as to whether the trademark LA was suggestive, descriptive, or generic when used to refer to low-alcohol beer. The court affirmed a finding of fact that LA was suggestive. The Eighth Circuit distinguished *National Conference of Bar Examiners* and *FS Services,* noting that *FS Services* held that abbreviations for generic terms must be treated as generic terms where those abbreviations are generally recognized. *Anheuser–Busch,* 750 F.2d at 636. The term LA was not generally recognized as an abbreviation for low-alcohol beer, so the term was suggestive rather than descriptive or generic. Because *National Conference of Bar Examiners* relied·upon *FS Services,* the Eighth Circuit reasoned that the holding in that case must likewise be qualified. The court added, "We do not believe that the presence of a very brief statement in a case

from another circuit made in an entirely different factual context, which demanded no particular consideration of its import, should by its very presence cause its elevation to the status of an established rule of law." *Anheuser–Busch*, 750 F.2d at 636.

 In *Liquid Controls Corp. v. Liquid Control Corp.*, the court stated, "Merely descriptive terms are generally not protectable as trademarks 'both because they are poor means of distinguishing one source of services from another and because they are often necessary to the description of all goods or services of a similar nature.'" 802 F.2d 934, 936 (7th Cir. 1986) (citing *M.B.H. Enters., Inc. v. WOKY, Inc.*, 633 F.2d 50, 54 (7th Cir. 1980)). Here, "Manufacturers' Qualification and Validation Program" and "MQVP" are sufficiently distinctive to distinguish one source of services from another. Neither term is necessary to the description of services of a similar nature, as is proven by the fact that the only entity offering services of a similar nature is CAPA. Therefore, MQVP® is not descriptive. It is either suggestive or arbitrary. Accordingly, it can be protected whether or not it has acquired a secondary meaning.[3]

 The essential question in any case of alleged trademark infringement is whether purchasers are likely to be misled or confused as to the source of the products or services. *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1324 (8th Cir.1984). The Court must consider the following factors in determining whether a likelihood of confusion exists: "1) the strength of the mark; 2) the similarity between the parties' marks; 3) the competitive proximity of the parties' products; 4) the alleged infringer's intent to confuse; 5) evidence of actual confusion; and 6) the degree of care reasonably expected of potential customers." *Duluth News–Tribune*, 84 F.3d at 1096. The Eighth Circuit has explained:

These factors do not operate in a mathematically precise formula; rather, we use them at the summary judgment stage as a guide to determine whether a reasonable jury could find a likelihood of confusion. Factual disputes regarding a single factor are insufficient to support the reversal of summary judgment unless they tilt the entire balance in favor of such a finding.

*Id.*

"A strong and distinctive trademark is entitled to greater protection than a weak or commonplace one." *SquirtCo v. Seven–Up Co.*, 628 F.2d 1086, 1091 (8th Cir.1980). "Strength or weakness is primarily a question of assessment of a mark's distinctiveness or popularity. Where the public has been educated to recognize and accept a particular mark as the hallmark for a particular source of that product, or the mark itself is inherently unique or has been the subject of wide advertisement, it is a strong trademark." *E.I. DuPont de Nemours and Co. v. Yoshida Int'l, Inc.*, 393 F.Supp. 502, 512 (E.D.N.Y.1975). As noted above, the MQVP® mark is distinctive,

---

**3.** To establish secondary meaning, the user must show that the mark by long and exclusive use in advertising has become so associated in the public mind with the goods or services to which it refers that it serves to identify them and distinguish them from the goods and services of others. *Co–Rect Prods.*, 780 F.2d at 1330. The evidence on whether the MQVP® mark has acquired a secondary meaning is weak. Mid–State has adduced evidence that many collision repair shops in Arkansas have never heard of MQVP. On the other hand, MQVP, Inc., has offered evidence that some collision repair shops have some knowledge of MQVP. Some of these collision repair shops had been prompted by an insurer to request MQVP approved parts. Neither party adduced sufficient evidence to establish that there is no genuine issue of material fact as to whether the mark MQVP® has acquired a secondary meaning.

so in that sense it is a strong mark. On the other hand, the evidence indicates that it has little recognition among collision repair shops. If collision repair shops are the relevant market, the MQVP® mark is weak in regard to recognition and acceptance. No evidence has been addressed as to the extent of the MQVP® mark's recognition among manufacturers and distributors of aftermarket body parts or insurance companies.

As to the similarity between the parties' marks, it is undisputed that Mid–State has stated in advertising and verbally that it has "MQVP parts available." Hence, Mid–State has used the MQVP® mark verbatim.

As to the third factor, the inquiry relates to the degree of competition between the products. *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 830 (8th Cir.1999). If the MQVP® mark is a service mark, not a certification mark, this factor weighs in Mid–State's favor because Mid–State and MQVP, Inc., are not competitors. Mid–State is a parts distributor; MQVP, Inc., distributes no parts. MQVP, Inc., provides a registry of manufacturers that meet certain specifications and a program for tracing parts from the manufacturer to the vehicles on which they are placed; Mid–State provides no such services.

On the other hand, if the MQVP® mark were a certification mark, this factor would weigh in favor of MQVP, Inc. "In infringement litigation, the certification mark owner acts as the representative of the mark users and likelihood of confusion is measured by the related nature of the goods used by the certification mark users." 3 McCARTHY ON TRADEMARKS AND UNFAIR COM-

PETITION § 19:92.1. *See also E.I. DuPont de Nemours*, 393 F.Supp. at 516 (competitive proximity may not exist as to the certification mark owner, but it may be measured against the product of certification mark users). In responding to Mid–State's motion for summary judgment on this point, MQVP, Inc., stated, "While MQVP does not sell the parts Mid–State sells, MQVP does maintain a registry of manufacturers and distributors all of whom have contracts with MQVP and who in fact *do* compete directly with Mid–State."[4] In substance, MQVP, Inc.'s argument is that it is prosecuting this action as the representative of the mark users and that likelihood of confusion should be measured by the degree of competition between Mid–State and manufacturers and distributors licensed to use the mark who compete with Mid–State. Again, MQVP, Inc., reasons as though the mark is a certification mark while insisting that it is a service mark.

The next factor is the alleged infringer's intent to confuse. Mid–State has told collision repair shops that it could sell "MQVP parts." If the MQVP® mark were a certification mark, it might be reasonable to infer that Mid–State intended collision repair shops to believe that its parts were certified or validated by MQVP, Inc., even though it knew full well that the parts it sold could not be traced on the GOCERTS® system, and even though it knew that traceability was a part of the MQVP program.[5] On the other hand, Mid–State contends that it could sell "MQVP parts" because it had parts manufactured by MQVP approved manufacturers identical to parts sold by MQVP approved distributors; and it made no secret

---

4. In the same paragraph, MQVP, Inc., states that for participating manufacturers who adhere to the requirements of the program, "MQVP will attest to the parts' authenticity and traceability."

5. Mid–State alleged in its complaint that MQVP, Inc., had offered Mid–State a contract. A copy of that contract is attached to Mid–State's complaint as Exhibit B. That contract required participation in GOCERTS® and GOCAR®.

of the fact that it is not in the MQVP program. If the mark is a service mark, Mid–State has not directed its statements toward entities who would be customers or potential customers of MQVP, Inc.'s services—manufacturers, distributors, and insurance companies—which would indicate that Mid–State did not intend to confuse customers or potential customers of MQVP, Inc.'s services.

■ The fifth factor is evidence of actual confusion. Actual confusion is not essential to a finding of trademark infringement, but it is the best evidence of likelihood of confusion. *Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244, 1249 (8th Cir.1990). MQVP, Inc.'s principal evidence of actual confusion is testimony of conversations between Todd Knoedel, Mid–State's general manager, and representatives of Bill Terry's Collision Repair Center and the collision repair shop at Little Rock Dodge. Knoedel testified:

Q: Okay. Tell me what all you can recall about these conversations with Mr. Terry.

A: Pretty well that he was telling us that Nationwide was forcing him to—or let me rephrase that. They were trying to force him to buy all the parts, whether it was a blue ribbon or non-blue ribbon repair job, forcing him to use Keystone on the parts, and he was aware that our parts were the same parts. That we were just not an actual authorized distributor for MQVP.

Q: How was he aware of that?

A: I informed him.

Knoedel also testified to a similar conversation with a representative of Little Rock Dodge, who reported to Knoedel that John Arvay of MQVP, Inc., had said that Little Rock Dodge must buy its parts from Keystone because Mid–State did not have MQVP parts. Knoedel responded, "Of course, I let him know if he needed an MQVP part that if it was available, we could provide it to him even though we was not on the program or an authorized distributor."

If MQVP® were a certification mark, these conversations would be some evidence of actual confusion. On that assumption, these conversations would be evidence that two collision repair shops were led to believe that Mid–State could deliver parts that would be certified by MQVP, Inc., even though Mid–State was not an authorized distributor and was not in the program. In its brief in support of its motion for summary judgment as to its amended counterclaim, MQVP stated in arguing that these conversations showed actual confusion:

The confusion still exists. William Hindelang has testified that there is growing concern in the auto industry over the ability for any distributor to arbitrarily establish themselves as selling MQVP® parts. This has created concerns in the collision repair and insurance industries as to the value of the mark and whether there is really any value in paying monthly participation fees to be a participating member. MQVP® has been harmed by having to go out into the public and dispel these beliefs. Some companies have even delayed or decided against joining MQVP® because of Mid–State's spurious actions.

Once again, MQVP, Inc.'s argument treats its mark as a certification mark rather than as a service mark.

On the other hand, if MQVP® is a service mark, Knoedel's conversations with Bill Terry's Collision Repair Center and the collision repair shop at Little Rock Dodge are not evidence of actual confusion on the part of customers or potential customers of MQVP, Inc.'s services. MQVP, Inc., markets its services to manufacturers and distributors of aftermarket body parts and to insurance companies, not to collision repair shops. MQVP, Inc., has pre-

sented no evidence that any manufacturer, distributor, or insurance company was actually confused by Mid–State's statements. Mid–State's statements were not addressed to manufacturers, distributors, or insurance companies. Consequently, if MQVP® is a service mark, as MQVP, Inc., contends, there is no evidence of actual confusion.

The sixth factor is the degree of care reasonably expected of potential customers. MQVP, Inc., argues that collision repair shops do not have access to MQVP, Inc.'s contracts or manual, nor do they have access to GOCERTS®, so when they are told that they are buying MQVP parts, they have no reason to think otherwise. As is so often the case, this argument presupposes that MQVP® is a certification mark rather than a service mark. MQVP, Inc., is correct that, if Mid–State represents that the parts it sells are MQVP® approved, collision repair shops might not have the wherewithal to confirm or disconfirm that representation. But collision repair shops are not MQVP, Inc.'s customers. Collision repair shops buy parts from distributors, but MQVP, Inc., is not a distributor. If the MQVP® mark were a certification mark, it would be relevant to inquire as to what degree of care would be exercised by collision repair shops because those shops are customers of MQVP approved distributors, and MQVP, Inc., could act in this litigation as the representative of those distributors.

On the other hand, as noted above, MQVP, Inc.'s customers are not collision repair shops or consumers; its customers are manufacturers and distributors of aftermarket body parts and insurance companies. Those customers are likely to ex-

ercise a sufficiently high degree of care that they would not be deceived, even if Mid–State's statements were directed toward them. MQVP, Inc., maintains a website on which it names all of the participants in the program. It would be easy for a manufacturer, distributor, or insurance company to check the website or to call MQVP, Inc.'s office to verify Mid–State's relationship or lack thereof with MQVP, Inc.

 In reviewing all of the factors that the Court is required to consider in determining whether Mid–State's statements that it has "MQVP parts available" creates a substantial likelihood of confusion, the Court is convinced that, were MQVP® a certification mark, the factors would require a finding that a substantial likelihood of confusion exists. On the other hand, if MQVP® is a service mark, it is unlikely that potential customers of MQVP, Inc.'s services would be confused by Mid–State's statements that it has "MQVP parts available." Mid–State and MQVP, Inc., are not competitors. MQVP, Inc.'s customers and potential customers are not the target of Mid–State's statements. Mid–State's statements are directed toward collision repair shops, not toward manufacturers or distributors of aftermarket body parts or insurance companies. No evidence exists of actual confusion on the part of any manufacturer, distributor, or insurance company. Even if Mid–State were to direct its advertising toward manufacturers, distributors, or insurance companies, those entities would exercise a degree of care such that they would not be misled.

MQVP, Inc., has insisted throughout this case that its mark is a service mark, not a certification mark.[6] Since MQVP, Inc., in-

6. A certification mark can be canceled if the registrant does not exercise proper control. 15 U.S.C. § 1064(5). Mid–State has offered some evidence that MQVP, Inc., does not exercise proper control, which may explain MQVP, Inc.'s insistence that its mark is a service mark, not a certification mark. However, the Court need not and does not address that issue.

sists that its mark is a service mark, not a certification mark, the Court will treat it as such in ruling on the cross motions for summary judgment. It would be appropriate to do so even if MQVP, Inc., were to change its contention in the middle of this litigation, which it so far has not. *Cf. United States ex rel. Gebert v. Transp. Admin. Servs.*, 260 F.3d 909, 918 (8th Cir. 2001) (quoting *Hossaini v. W. Mo. Med. Ctr.*, 140 F.3d 1140, 1142 (8th Cir.1998)). Viewing the MQVP® mark as a service mark and considering all of the factors discussed above, Mid–State's statements that it has "MQVP parts available" creates no likelihood of confusion among MQVP, Inc.'s customers or potential customers. The facts are undisputed. The dispute hinges on the proper interpretation to be given to the facts rather than on the facts themselves, so summary judgment is appropriate. *Duluth News–Tribune*, 84 F.3d at 1099. Mid–State is entitled to judgment as a matter of law because its statements do not create a likelihood of confusion on the part of customers or potential customers of MQVP, Inc.'s services. Accordingly, the Court grants summary judgment in favor of Mid–State and against MQVP, Inc., on Mid–State's complaint and on MQVP, Inc.'s claims under the Lanham Act, which include counts I, II, and III of MQVP, Inc.'s amended counterclaim.

### (c) Unfair Competition Under State Law

MQVP, Inc.'s claims under the Arkansas Deceptive Trade Practices Act, Ark.Code Ann. § 4–88–101 *et seq.*, and its claims of common law unfair competition, require proof of substantially the same essential elements as its claims under the Lanham Act. *Gaston's White River Resort*, 701 F.Supp. at 1434–35. MQVP, Inc., has alleged under both of those counts the existence of a likelihood of confusion. Therefore, for the same reasons as stated in ruling on the cross motions for summary

judgment under the Lanham Act, the Court grants Mid–State's motion for summary judgment on MQVP, Inc.'s claims of deceptive trade practices arising under Ark.Code Ann. § 4–88–101 *et seq.* (Count IV of MQVP, Inc.'s amended counterclaim) and on MQVP, Inc.'s common law unfair competition claim (Count V of the amended counterclaim).

### (d) Tortious Interference

■ The only remaining claim is MQVP, Inc.'s claim of tortious interference with business expectancies, which is Count VI of MQVP, Inc.'s amended counterclaim. Tortious interference requires a plaintiff to prove: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Mid–South Beverages, Inc. v. Forrest City Grocery Co.*, 300 Ark. 204, 205, 778 S.W.2d 218, 219 (1989). A plaintiff must also show that the defendant's interference was improper. *Faulkner v. Ark. Children's Hosp.*, 347 Ark. 941, 959, 69 S.W.3d 393, 405 (2002) (citing *Mason v. Wal–Mart Stores, Inc.*, 333 Ark. 3, 13–14, 969 S.W.2d 160, 165 (1998)).

■ MQVP, Inc.'s business expectancies relate to contracts or potential contracts with manufacturers and distributors of aftermarket body parts and with insurance companies. As noted above, there is no evidence that Mid–State has communicated with any manufacturer, distributor, or insurance company, nor is there evidence that Mid–State has interfered with any contract or potential contract between

MQVP, Inc., and any manufacturer, distributor, or insurance company. Therefore, the Court enters summary judgment in favor of Mid–State and against MQVP, Inc., on MQVP, Inc.'s claim of tortious interference with business expectancies.

## V.

Mid–State has also filed a motion titled "Plaintiff's Motion to Compel and Entry of Protective Order" in which it requests the Court to order MQVP, Inc., to recant an e-mail message sent to MQVP, Inc.'s program participants regarding this litigation. Mid–State asserts that the message was misleading. Mid–State cites no authority, and the Court is aware of none, authorizing such an order. Therefore, the Motion to Compel and Entry of Protective Order is denied.

## CONCLUSION

Mid–State's motion for summary judgment (Docket # 73) is GRANTED. MQVP, Inc.'s two motions for summary judgment (Docket # 66 and # 69) are DENIED. Mid–State's motion to compel and entry of protective order (Docket # 89) is DENIED. MQVP, Inc.'s motion for hearing on summary judgment (Docket # 78) is moot because the Court has held such a hearing.